IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| City of Tombstone,<br><br>    Plaintiff,<br><br>vs.<br><br>United States of America, et al.,<br><br>    Defendants. | No. CV 11-845-TUC-FRZ<br><br>**ORDER** |

Pending before the Court is Plaintiff's second motion for a preliminary injunction. For the reasons stated below, the motion is denied.[1]

**STANDARD FOR A PRELIMINARY INJUNCTION**

A preliminary injunction is an extraordinary and drastic remedy. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); FED.R.CIV.P. 65. To obtain a preliminary injunction, the moving party generally must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Resources Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

In the Ninth Circuit, "the 'serious questions' approach survives *Winter* when applied as

---

[1] The Court notes that it previously held two separate evidentiary hearings related to this dispute where the parties presented numerous witnesses who gave live testimony and were subject to cross examination.

part of the four-element *Winter* test. In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met . . . That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32, 1135 (9th Cir. 2011).

**BACKGROUND**

The City of Tombstone (hereinafter, "Tombstone" or "Plaintiff") seeks to prevent the United States Forest Service (hereinafter, "USFS" or "Defendants") from interfering with its ability to adequately access various water sources that deliver water to Tombstone. The water system in question is within the Coronado National Forest in the Huachuca Mountain Wilderness Area. During the summer of 2011, there was a large fire in these mountains (the Monument Fire) that destroyed vegetation; after the fire, there was a large amount of rainfall that caused rocks and debris to slide down the mountain that damaged the water system. Tombstone claims that it is facing a serious water shortage as the water system in the Huachuca Mountains is a significant source of its water. Tombstone claims that while it has three separate wells that it can and does use to supply water to the city, there have been problems with contamination that limit the full use of this well water.

Tombstone claims that since approximately September of 2011, it has been attempting to access areas in the Huachuca Mountains to repair its water system, but that officials from the USFS have hindered their efforts by insisting that they need authorization from the USFS to access the land and make the repairs. The USFS has been insisting that they specify what repairs they plan to do as to each damaged section of the water system, and specify what materials and equipment they will be using to make the repairs. Tombstone claims that it is not required to receive authorization from the USFS, and even if it was, that it has given the USFS enough information to authorize all of its requested actions in the Huachuca

1  Mountains. Tombstone claims that it has been using the water system in the Huachuca
2  Mountains since the 1800's, and that there are numerous property filings and documents
3  exchanged with the federal government that reflect that it has ownership or a right-of-way
4  on the federal National Forest land at issue to go on the land unhindered by the federal
5  government to address the water system.
6      Defendants dispute Plaintiff's position, argues that its position is based on vague, informal,
7  unsubstantiated documents, and that determining water rights and rights to land dating back
8  to the 1800's is a fact intensive task that can not be decided at this very early stage of the
9  litigation. In contrast to Tombstone's position, the USFS claims that it has devoted an
10 immense amount of resources and done everything in its power to expeditiously authorize
11 Tombstone's requests to address the water system in the Huachuca Mountains. However, the
12 USFS argues that it is required by federal statutes and regulations (including the National
13 Environmental Policy Act-"NEPA" and the Endangered Species Act-"ESA") to evaluate the
14 impact Plaintiff's proposed actions will have on the National Forest areas in question. For
15 example, when a party proposes to use mechanized equipment on National Forest land such
16 as Plaintiff, the USFS evaluates that action and issues a Minimum Requirements Decision
17 Guide ("MRDG") specifying the appropriate equipment and actions that can be taken on
18 federal land such that damage is minimized to protected areas such as the National Forest.
19  Plaintiff, for example, seeks to engage in ground-disturbing activities with heavy equipment
20 (excavators, tractors, etc.) that have to cross in and out of federal land, disturb the land by
21 digging and removing land, and removing damaged materials and inserting new materials
22 into the land to address the water system. As the USFS is charged with the responsibility of
23 preserving National Forest land for the enjoyment of all citizens, it argues that it required to
24 evaluate and authorize Tombstone's actions. To perform this task, the USFS argues that it
25 has informed Tombstone on numerous occasions that it must submit site specific information
26 informing it of the specific actions, materials, and equipment it plans to use at damaged sites.
27 Despite numerous requests by USFS, it claims that Tombstone has largely failed to provide
28 the specific information requested such that USFS can perform its mandated duties to

1 evaluate Tombstone's actions.  For example, the mayor of Tombstone requested a blanket
2 permit to address all of its claimed springs in the Huachuca Mountains based on his position
3 that Tombstone had a right to access the land in question to repair the water system without
4 interference; this demand appears to be based on a hand-written 1901 sketch map that
5 appears to show numerous springs in the Huachuca Mountains.  However, as this 1901 map
6 had no detailed information pertaining to the site specific activities, materials, and equipment
7 that would be used, the USFS could not issue any authorization (blanket or otherwise).  In
8 addition, the USFS argues that it has had numerous meetings with Tombstone informing
9 them of the information they need, and have had USFS engineers and other personnel work
10 with Tombstone to give them recommendations on the type of materials, equipment, and
11 action to take to receive authorization for work from the USFS.

To the extent Tombstone has submitted site specific information informing it of the specific actions, materials, and equipment it plans to use at damaged areas, the USFS argues that it acted as quickly as possible to authorize the repairs, and that it has already expeditiously issued authorizations to Tombstone.  The USFS argues that Tombstone has repeatedly failed to provide site specific information as to each location, and that Tombstone's failure to do so has resulted in an inefficient, piecemeal process that has resulted in unnecessary delays for Tombstone.  In addition, Defendants argue that Tombstone has otherwise failed to provide sufficient information entitling it to unfettered access to the 25 water sources at issue, Plaintiff's water from the Huachuca mountains has been substantially restored, Plaintiff currently has access to sufficient and safe water between its wells and the Huachuca water, and that Plaintiff's claims of a drastic water emergency related to public consumption and fire needs are overstated and speculative.

The Court agrees with Defendants' position.

## **DISCUSSION**

### ***The Quiet Title Act***

A review of Plaintiff's Amended Complaint reflects that Plaintiff alleges three Counts for

- 4 -

relief pursuant to the Administrative Procedure Act ("APA"), one count for relief pursuant to the Tenth Amendment, and one count for relief pursuant to the Quiet Title Act ("QTA"). Pursuant to the motion for a preliminary injunction, Plaintiff only claims preliminary injunctive relief on the merits pursuant to the APA and Tenth Amendment. However, as Defendants correctly argue, Plaintiff's appear to argue only the merits of the APA and Tenth Amendment claims as a basis for relief in the motion for a preliminary injunction as a means to make an end-run around the limitations of the QTA which prohibit preliminary injunctive relief. Plaintiff essentially argues that Defendants have no right to interfere with their ability to enter National Forest land and make the repairs at issue as it essentially owns, without limitation, a right-of-way to enter the land and make necessary repairs to its water system. As with all purported civil actions against the federal government, the Government can only be sued to the extent it has clearly and explicitly consented to be sued under a specific statute. The United States, as a sovereign entity, must waive its sovereign immunity against suits. *See McCarthy v. U.S.*, 850 F.2d 558, 560 (9th Cir. 1988). A waiver can only occur when Congress has unequivocally expressed its intention to do so. *See Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). Whether immunity has been waived is a question of subject matter jurisdiction. *See McCarthy*, 850 F.2d at 560.

While Plaintiff does not explicitly state it in the motion for a preliminary injunction, Plaintiff appears to primarily bring this case under the QTA arguing that it has a right to operate and maintain the rights-of-way on the federal land at issue. While the QTA (28 U.S.C. §2409a) does waive sovereign immunity to be sued over disputes over federal real property, the Court has no jurisdiction to grant a preliminary injunction. See 28 U.S.C. §2409a(c) ("No preliminary injunction shall issue in any action brought under this section."); 28 U.S.C. §2409a(b) ("The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days . . ."); *see also* 28 U.S.C. §2409(n)("Nothing in this section shall be construed to permit suits against the United States based upon adverse possession [i.e., continuous, open use of certain federal land for many

years as the sole basis for ownership].").

In light of these provisions, Plaintiff seeks to subvert the limitations in the QTA by basing preliminary injunctive relief on the APA and Tenth Amendment. However, the relief pertaining to the "vested rights" Plaintiff claims in this case arise under the QTA and preliminary injunctive relief is not available. *See*, *e.g.*, *Block v. North Dakota*, 461 U.S.273, 286 (1983) ("Only upon passage of the QTA did the United States waive its immunity with respect to suits involving title to land. Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute-they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief.. . . We hold that Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property . . . In light of [the QTA's] legislative history, we need not be detained long by North Dakota's contention that it can avoid the QTA's statute of limitations and other restrictions by the device of an officer's suit. If North Dakota's position were correct, all of the carefully-crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted. It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading."; rejecting claims pursuant to the APA and Tenth Amendment as a means to get around the limitations of the QTA); *State of Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994)("The Court in *Block* explicitly rejected the theory that one could avoid the limitations of the QTA by bringing an action under the APA . . . [W]hen the [U.S.] has an interest in the disputed property the waiver of sovereign immunity must be found, if at all, within the QTA."); *Friends of Panamint Valley v. Kempthorne*, 499 F.Supp. 2d 1165, 1178-79 (E.D. Cal. 2007)("A claim that seeks a title determination against the [U.S.] can only be brought under the Quiet Title Act, not the Declaratory Judgment Act or any other law."); *Shawnee Trail Conservancy v. U.S.D.A*, 222 F.3d 383, 388 (7th Cir.2000), *cert. denied*, 531 U.S. 1074 (2001) ("[T]o allow claimants to avoid the QTA by characterizing their complaint as a challenge to the federal government's

regulatory authority would be to allow parties to seek a legal determination of disputed title without being subject to the limitations placed on such challenges by the Quiet Title Act"); *Kane County, Utah v. Kempthorne*, 495 F.Supp.2d 1143, 1159 (D. Utah 2007) ("The Counties' allegation that the Management Plan's restriction on the use of off-highway vehicles on roads within the Monument infringes on the Counties' right to regulate their own R.S. 2477 rights-of-way asserts an injury-in-fact to their legally protected interests in those rights-of-way. But the defendants correctly point out that the 'legally protected interests' in question are property rights ostensibly vested in the Counties by operation of the statute, and disputes concerning property rights on federal land must be brought into federal court pursuant to the Quiet Title Act . . . not the Administrative Procedure Act . . . This is no less true where a plaintiff alleges that the existence of an R.S. 2477 right-of-way invalidates an agency's decision to close or limit the use of a road . . . The Counties' allegations concerning injury-in-fact to their 'valid existing rights' resulting from the Management Plan's OHV restrictions necessarily implicate questions of title, viz., the existence and historical scope of the Counties' claimed R.S. 2477 rights-of-way within the Monument's boundaries. The Counties have not pleaded their existing OHV claims under the Quiet Title Act, and to that extent, they must be dismissed for want of jurisdiction.").

Based on the foregoing, the Court finds that Plaintiff's APA and Tenth Amendment claims arising out of its "vested rights" must fail at the preliminary injunction stage as any such claims must be brought under the QTA which precludes the preliminary relief Plaintiff seeks in this case.  Nevertheless, the Court shall address Plaintiff's remaining claims.

### ***Serious Questions Going to the  Merits***

#### ***APA***

Pursuant to the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.**"** 5 U.S.C. §702.  Agency action is defined pursuant to 5 U.S.C. §551(13): "'agency action' includes the whole or a part of an agency rule, order,

1 license, sanction, relief, or the equivalent or denial thereof, or failure to act". *See also* 5
2 U.S.C. §706(2) (discussing a court's authority to address certain agency action). Typically,
3 only "final agency action" is subject to judicial review, and as "a general matter, two
4 conditions must be satisfied for agency action to be final: First, the action must mark the
5 consummation of the agency's decisionmaking process . . . -it must not be of a merely
6 tentative or interlocutory nature. And second, the action must be one by which rights or
7 obligations have been determined, or from which legal consequences will flow". *Bennett v.*
8 *Spear*, 520 U.S. 154, 178 (1997) (internal quotes and citations omitted).

9 Based on the Court's review of the record, there has been no final agency action that is
10 properly subject to judicial review. First, there certainly has been no consummation of the
11 Defendants' decision making process. Rather, the record reflects that Defendants have
12 consistently and continually worked with Plaintiff to attempt to resolve their water issues.
13 There have been numerous communications between the parties where Defendants have
14 attempted to accommodate Plaintiff's requests to repair water structures, have consistently
15 encouraged Plaintiffs to submit site specific information with details as to the work that
16 needs to be performed and the equipment needed such that Defendants could properly assess
17 any impacts in the wilderness, and Defendants have been receptive to Plaintiff's requests and
18 have changed certain requirements after considering Plaintiff's concerns. Rather, Tombstone
19 failed to provide adequate information with details as to the work that needed to be
20 performed and the equipment needed such that Defendants could properly assess any impacts
21 in the wilderness. Tombstone has failed to provide Defendants with sufficient information
22 to actually locate the majority of the 25 claimed springs on the ground, and Defendants
23 independent search for the 25 claimed springs also has not revealed the location or existence
24 of the majority of those springs other than the 6 springs originally identified and included in
25 the 1962 Special Use Permit ("SUP" or "1962 SUP"). As such, there has been no "final
26 agency action" for purposes of judicial review.

27 As to the "second [condition to establish final agency action subject to judicial review],
28 the action must be one by which rights or obligations have been determined, or from which

1  legal consequences will flow"; the Court finds that this condition also has not been satisfied.
2  *See id.* Plaintiff argues that the 1962 SUP was an open-ended permit that allowed it to do
3  any maintenance and improvement in any manner it deemed appropriate; Plaintiff insists that
4  Defendants' actions in disallowing Plaintiff to conduct its work and use equipment in the
5  manner it thinks necessary demonstrates final agency action subject to judicial review.
6  However, as discussed above, the first condition pertaining to final agency action has not
7  been demonstrated based on the record before the Court. Furthermore, the 1962 SUP is not
8  nearly as broad as argued by Plaintiff, and Defendants are enforcing the SUP within the
9  parameters originally contemplated by the parties; the circumstances before the court do not
10 reflect "action . . . [wherein] . . . rights or obligations have been determined, or from which
11 legal consequences will flow." *Id.* Plaintiff's Exhibit 58 containing the 1962 SUP omits the
12 three pages of detailed restrictions that shows that the SUP is not nearly as broad as
13 represented. While Plaintiff argues that the SUP authorized Tombstone "to do improvement
14 work at all of the spring impound areas and along all of the existing and future pipelines,
15 when such improvements are deemed necessary" via approving Tombstone's application for
16 a SUP, the 1962 SUP does not actually use that language. That language is only contained
17 in Tombstone's application seeking the 1962 SUP, not in the 1962 SUP itself. Furthermore,
18 the SUP only specifically incorporated the "maps" submitted in Tombstone's application as
19 part of the permit; it did not incorporate any additional statements that happened to be
20 included along with the maps in Plaintiff's application. The 1962 SUP contains many
21 limitations, including: the right to revoke or terminate the SUP; it only applies to 6 springs
22 (and Tombstone only sought a SUP for 6 springs, as opposed to the 25 springs it now seeks
23 access to); it does not allow Plaintiff to make improvements and use any equipment it sees
24 fit without Defendants input and approval, and otherwise specifies that "construction or
25 occupancy and use under this permit shall begin within 6 months and construction, if any,
26 shall be completed within 14 months from the date of the permit . . . Development plans;
27 layout plans; construction, reconstruction, or alteration of improvements; or revision of
28 layout and construction plans for this area must be approved in advance and in writing by the

1 forest supervisor. Trees or shrubbery on the permitted area may be removed or destroyed
2 only after the forest officer in charge has approved, and has marked or otherwise designated
3 that which may be removed or destroyed." The record before the Court does not reflect final
4 agency action.[2]

The Court finds that Plaintiff has not demonstrated serious questions going to the merits (or a likelihood of success) on the APA claims in this case.[3]

### ***Tenth Amendment***

Plaintiff argues that the Tenth Amendment has been violated as Defendants' actions have essentially commandeered Plaintiff's property and Defendants have directly regulated the State through its political subdivision in violation of *Printz*. *See Printz v. U.S.*, 521 U.S. 898 (1997) (finding that the Tenth Amendment was violated where Congress, through the Brady Handgun Violence Protection Act, compelled the chief law enforcement officer in each local jurisdiction to conduct background checks pertaining to purchasers of firearms in compliance with the Brady Act). The Court disagrees.

---

[2] Plaintiff's cites to *Sackett* in support of its final agency action position; however, *Sackett* applied to a compliance order that compelled Plaintiff to take specific action; here, Defendants are simply enforcing the terms of the 1962 SUP in relation to Plaintiff's current requests; in addition, while the 1962 SUP was final agency action, a six year statute of limitations applies to such APA challenges. *See Sackett v. EPA*, 132 S. Ct. 1367 (2012); *Or. Nat. Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 990 (9th Cir. 2006); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010). In addition, to the extent Plaintiff has sought to engage in activities beyond that previously covered by the 1962 SUP, Defendants have clearly communicated the appropriate and reasonable process that must be followed such that compliance with applicable laws can be accomplished.

[3] To the extent Plaintiff alleges a claim based on agency guidelines, Plaintiff has no enforceable rights based on such guidelines. *See Schweiker v. Hansen*, 450 U.S. 785, 789 (1981). Likewise, to the extent that Plaintiff claims relief (related to the merits and irreparable harm) arising out of 36 C.F.R. §251.60(a) and (f), those regulations are of no moment under the circumstances at bar because they only apply to the termination, revocation, and suspension of permits which is inapplicable as this has not occurred in this case. Lastly, Plaintiff's argument relating to Defendants' frustrating the purpose of their easements is unpersuasive as any such easements have not been established, Plaintiff has not demonstrated what water infrastructure actually existed in the past and currently as to the 25 water sources (as opposed to the 6 covered by the SUP), Defendants have appropriately approved repairs for the 6 water sources covered by the SUP, and clearly conveyed the reasonable procedures as to sources not covered by the SUP.

"If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. U.S.*, 505 U.S. 144, 156 (1992).  The Property Clause of the Constitution provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States: and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State."  Art. IV, §3, clause 2; *see also U.S. v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1997) ("The Supreme Court has consistently recognized the expansiveness of this power [in the Property Clause], stating that the power over the public land thus entrusted to Congress is without limitations.") (internal quotes and citations omitted).  The record before the Court reflects that Defendants have engaged in appropriate regulation relating to federal land, and have not commandeered state property or improperly regulated the State.[4]  The Court finds that Plaintiff has not demonstrated serious questions going to the merits (or a likelihood of success) on the Tenth Amendment claims in this case.

### ***Irreparable Harm; Balance of Equities and Public Interest***

To the extent Plaintiff asserts water rights (in contrast to the rights to the large swaths of land related to that water) as a basis for harm, the Court does not have proper jurisdiction over this issue.  Pursuant to 43 U.S.C. §661: "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the

---

[4] Plaintiff cites the test in *Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976) to support its position; however, *Nat'l League of Cities* was overruled and the test is nevertheless inapplicable in this case.  *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985); *New York v. U.S.*, 505 U.S. at 160.

purposes herein specified is acknowledged and confirmed . . . " This statute does not explicitly waive the Government's sovereign immunity such that it can be sued pursuant to this statute. The QTA recognizes that a suit for water rights against the United States can be brought under 43 U.S.C. §666 (often called the "McCarran Amendment"), as opposed to the QTA itself. The Court does not have jurisdiction to resolve a dispute under §666 because it is a very limited waiver of the Government's sovereign immunity. Section 666 only allows the U.S. to be joined as a defendant into a comprehensive litigation seeking to resolve the water rights of all parties that have any interest in a particular water source; thus, the statute permits the U.S. to be joined in a comprehensive state action resolving all waters rights of all interested parties. *See Gardner v. Stager*, 103 F.3d 886, 888 (9th Cir. 1996) ("The McCarran Amendment, 43 U.S.C. § 666, provides for a limited waiver of the sovereign immunity of the United States in certain circumstances where water rights are concerned. This waiver, however, is limited to comprehensive adjudications of all of the water rights of various users of a specific water system . . . The McCarran Amendment does not authorize private suits to adjudicate water rights between particular claimants and the United States . . . The waiver of sovereign immunity provided by the McCarran Amendment is therefore inapplicable to Gardners' private suit for water rights against the United States . . . Moreover, when there is a comprehensive litigation of the water rights of the users of a particular water system ongoing in a state tribunal, the federal court may dismiss a water rights suit brought by a private party."); *see also State ex rel. Arizona State Land Dept. V. Robinson Cattle, LLC*, 2011 WL 2695774, *3 (Ariz. Ct. App. 2011)("No legal authority supports Robinson's position that it owns the parcel in fee simple, as there is no congressional authorization for the establishment of fee simple ownership in public lands based on historical use and local law and custom . . . The Act of 1866 plainly is limited to acknowledging water rights and associated ditch rights-of-way.").

The purpose of the McCarran Amendment was to avoid inefficient, costly, piecemeal litigation of separately filed lawsuits; thus, §666 does not waive the United States' sovereign immunity to be sued in a private lawsuit between one particular claimant and the United

States. *See id.* This is exactly what Tombstone is attempting to do in this case, and the Court has no jurisdiction to hear such a water rights claim by Tombstone. Furthermore, as the Government points out, there is a comprehensive mass litigation in state court that has been ongoing since 1981 that covers the water sources that Tombstone is seeking to litigate in this case, and the United States has been a party in that case for many years. *See In re General Adjudication of All Rights to Use Water In Gila River System and Source*, 127 P.3d 882 (Ariz. 2006). As to that litigation, Plaintiff has only filed claims as to five water sources (as opposed to the 25 at issue in this case).

Plaintiff's arguments related to the 1962 SUP and its police power largely overlap with the issues considered in relation to the merits issues above relating to the APA and Tenth Amendment; Plaintiff's arguments are rejected.

Based on the record before the Court, Defendants properly regulated and addressed the actions at issue. In addition, as referenced above, Plaintiff failed to properly establish where the numerous springs are located and the associated infrastructure that was in place at the time of the Monument fire, has not adequately shown the amount of water it was receiving from the 25 sources prior to the fire, and which of the 25 water sources were or were not producing water at the time of the fire. Further, it appears that Plaintiff's water from the Huachuca mountains has been substantially restored, Plaintiff currently has access to sufficient and safe water between its wells and the Huachuca water, and that Plaintiff's claims of a drastic water emergency related to public consumption and fire needs are overstated and speculative. Rather, it appears that Plaintiff is largely attempting to engage in activity resulting in new construction and action that was not covered by the 1962 SUP, as opposed to simply restoring existing water facilities. Upon review of the record, the Court finds that Plaintiff has not demonstrated irreparable harm. Likewise, the Court also finds that Plaintiff cutting a path through a federally protected wilderness area with excavators and other construction equipment would have a significant impact; the public interest and equities weigh in favor of Defendants who are attempting to conserve and protect important wilderness areas.

1 **CONCLUSION**

2 Accordingly, IT IS HEREBY ORDERED that Plaintiff's motion for a preliminary
3 injunction is denied.

5 DATED this 14th day of May, 2012.

Frank R. Zapata
Senior United States District Judge

- 14 -